## 15170

### STATE v. HANN

(12 S. E. (2d), 720)

*Mr. B. F. Martin* for appellant,

*Messrs. Robert T. Ashmore, Solicitor* and *Mann & Mann* for respondent.

December 2, 1940.

The opinion of the Court was delivered by MR. ACTING ASSOCIATE JUSTICE L. D. LIDE.

The defendant J. C. Hann, a young white man about 27 years old, employed in a cotton mill at Easley, was indicted at the September, 1939, term of Court of General Sessions for Pickens County upon the charge of murder, and was tried on this indictment at the February, 1940, term of the Court. He was found guilty, and motions for arrest of judgment and for a new trial being overruled, the death sentence was imposed by the presiding Judge; and the case comes before this Court upon the exceptions set forth in the record.

The evidence shows that on the morning of June 6, 1939, probably between 6:30 and 7:00 o'clock, the defendant called at the home of Miss Ruby Boling, a young woman about 23 years of age, in Easley. Her mother went to the door when the defendant knocked thereon and at his request called her daughter Ruby, who had not then gotten up, but in a few minutes she came to the door, and she and the defendant spoke to each other in a friendly way and went out together on the porch of the house. Shortly thereafter the mother heard her daughter scream, and when she went out found the defendant in the yard with her daughter holding her and attacking her with a razor. There were several witnesses who testified that they saw the defendant make these deadly assaults. And a physician testified that there were three wounds on the left side of the neck of the young woman and two on the right, that these wounds were deep gashes cut through the jugular vein and the carotid artery on the left side and the jugular vein on the right side, and that she lived approximately two or three minutes with these blood vessels cut.

We quote the following from the graphic testimony of one of the eye witnesses to the tragedy:

"The first thing that attracted my attention that morning was a scream—it didn't sound like a child's scream but it sounded like the scream of a grown woman. I ran out and saw J. C. Hann holding Ruby Boling with his left hand and cutting at her with his right hand; I could see the blood coming from her. He turned her loose and she sat down on the curb. She got up and it looked to me like he hit or slapped her. She then ran in Mr. Chastain's yard and fell down. I went up on the porch and my mother told me not to go out. He stood looking at Ruby and said he was not going to hurt us. I later saw the razor hanging in a rose bush. That is the same razor; the one you have in your hand there with blood and hair on it. I noticed that gap in it at the coroner's inquest. I don't know who got the razor out of the rose bush. After the killing J. C. walked back up the street slinging blood off of his hands; he acted composed. When he started out the street and walked by my mother he didn't act like he was drunk and he didn't look like he was crazy. I have been knowing J. C. Hann about six years."

It appears from the testimony that the defendan't grievance against the deceased was that he had acquired a venereal disease from her which was interfering with his prospective marriage with another woman, although the evidence is conflicting as to whether this grievance had any factual basis or was merely fanciful. There was testimony that shortly before the killing the defendant had said, speaking of the deceased, "I'm going to cut her head off and throw it out of the window," and this was said while he was under the influence of liquor, it appearing that he was an habitual user of alcoholic drinks. Indeed, one of his defenses is insanity as a result of alcoholism. The defendant testified in his own behalf, and we quote the following from his direct examination:

"I went down to the store and bought a pack of cigarettes and then went over to Mrs. Boling's house and knocked on the door; I asked for Ruby and in a few minutes she came

out. We spoke pleasantly and sat down on the swing to talk. I stayed there something like ten or fifteen minutes. I told her that she had ruined my life and broken up my engagement and she said that she didn't care; she said: 'I want you to know that I am as good as that girl over there;' and then I said, 'You aint nothing but a little whore;' I struck at her and my mind went blank; I didn't know what I was doing and I turned and went back out in the street and Mr. Tinsley came and got me."

Later he said on cross examination: "I asked for Ruby and she came out on the front porch—I can't talk—I don't know why I had that razor in my pocket. She insulted me about the girl I was engaged to when I told her what she had done to me and I jumped up; she then slapped me. She turned and went down the steps; I did not pull my razor out until we got in the yard; I don't know what happened then. No, sir, I did not hear anyone scream; I just don't remember. I did not know that I had cut her until after I came to; I then realized what I had done."

And we also quote the following from his cross examination:

"I told Gladys Youngblood while we were in swimming that I should cut Ruby Boling's head off.

"Q. Mr. Hann, you had it in your heart to kill Ruby Boling? A. No, sir.

"Q. You were mad at her because you thought she gave you gonorrhea; tell us isn't that the truth, before God, wasn't that the truth, you were mad at that girl and you killed her? A. Yes, sir, and I am sorry, and I ask mercy, I am deeply sorry.

"Q. Before God you planned to kill her? A. No, sir.

"Q. On Monday afternoon you planned to kill her and it was in your heart to do that thing? A. I had it in my mind at the time.

"Q. And you were going to cut her head off like this young lady said? A. I said I would."

One of the questions raised by this appeal is that the presiding Judge committed an error in his charge on the plea, or defense, of insanity, in that he charged the jury as follows: "I charge you that in order to relieve one of responsibility for a criminal act by reason of insanity, that is, mental unsoundness, one must show that he was under a mental delusion by reason of mental disease, and that at the time of the act, he did not know that the act he committed was wrong, or criminal, or punishable, either one or the other."

And he also charged to the same effect as follows: "I charge you that if one pleads insanity as a defense, the burden is upon him to prove by the greater weight or preponderance of the evidence that at the time he committed the act he was insane—that is, that at the time he committed the act he was under a mental delusion by reason of mental disease, and that he did not know that the act that he committed was wrong, or criminal, or punishable, either one or the other.

The point is made that these instructions placed the additional burden on the defendant of showing not only that he was mentally incapable of distinguishing right from wrong at the time of the act, but that he was also laboring under a mental delusion; although the Judge correctly charged that under the law of this State the test is mental capacity or want of it sufficient to distinguish moral or legal right from moral or legal wrong, and recognize the particular act charged as morally or legally wrong.

The language used by the presiding Judge, of which complaint is made, is admittedly precisely in accordance with the charge on the subject of insanity which was approved in the case of *State v. Bundy*, 24 S. C., 439, 58 Am. Rep., 263, and this case has been cited with approval by this Court so often, and followed so frequently by Circuit Judges, that it may well be regarded as a classic. Indeed, we think that counsel for the defendant overlooks the fact that if one com-

mitted an act violently criminal in its nature, but was at the time so mentally incapable of distinguishing right from wrong that he did not know or realize what he was doing, the conclusion must inevitably be drawn that he was under the influence of a mental delusion of some kind, which simply means an error of the mind.

The charge does not require proof of two distinct elements, one, lack of mental capacity, and the other, presence of mental delusion; but is simply a statement that inability to distinguish between right and wrong, resulting from a mental delusion due to mental disease, is a good defense. And it may be observed that the trial Judge correctly charged the request of defendant's counsel on the defense of mental incapacity arising from long continued and excessive drinking, resulting in "impairment or derangement of the mind". We cannot conceive how the defendant could have been in anywise prejudiced by the charge of the Court on this subject, especially when the entire charge is considered. The presiding Judge went into the whole matter fully and carefully, stating the law as favorably to the defendant as established principles would warrant, charging all requests presented by defendant's counsel.

It appears from the record that just before the motions for arrest of judgment and for a new trial were argued counsel for defendant referred to a conversation "I have just had in your Honor's chambers with the Solicitor and Mr. Mann and your Honor", and was inquiring as to whether any reference should be made to that or not, but was told repeatedly that if he desired to put anything in the record on the subject he might do so. Among other things the Court said: "If there is any statement you care to make now you can make (it) and the stenographer will take it down"; but counsel did not avail himself of this privilege. There is, therefore, no basis in the record for any exceptions relating to the conversation mentioned; nor is it

conceivable that the defendant's rights have been in anywise thereby prejudiced.

It further appears that the presiding Judge in ruling on the motions in arrest of judgment and for a new trial called attention to the fact that before the trial commenced he made special inquiry as to whether objection would be interposed to the indictment upon the ground that the members of the grand jury did not have proper registration certificates, and incidentally alluded to the circumstance that he had called Mr. Martin, the defendant's counsel, to his desk shortly after this inquiry and talked to him further about the matter. It is true that there had been an *express* waiver by counsel for the defendant made in the hearing of the defendant himself and of all present, but the Court may have felt that further inquiry of counsel would not be amiss to avoid any possible misunderstanding. The exception relating to this matter is clearly without merit.

This brings us to the consideration of the principal ground of this appeal, to wit, that the grand jury which found a true bill against the defendant at the September, 1939, term of Court was composed of jurors who were not qualified electors, from which it is asserted by the defendant that under the Constitution the Court had no jurisdiction and that hence the finding of the grand jury was null and void; and that the indictment should be so declared, notwithstanding the express waiver on the part of the defendant, it being contended that the defendant was without power to waive the disqualification in question.

The following is a statement of the undisputed facts relevant to this inquiry: As above stated a true bill was found against the defendant by the grand jury at the September, 1939, term of the Court, and at this term the defendant pleaded not guilty, making no objection to the grand jury, or any other objection to the indictment, at that time. However, it should be said that his counsel was not present, and furthermore the facts upon which the ob-

jections were subsequently made were not then known to the defendant or his counsel.

But in the meantime, to wit, on November 30, 1939, the opinion of this Court was rendered in the case of *State v. Bibbs,* 192 S. C., 231, 6 S. E. (2d), 276, 282, wherein it was held that the defendant in that case, who had been convicted of murder, was entitled to a new trial upon the following grounds: "We have reluctantly come to the conclusion that the Grand Jury which found the indictment upon which the appellant was prosecuted was not a legally qualified one, for the reason that at least five of its members who participated in its finding were not legally registered electors, because it is shown by the record that they were not legally registered, because their certificates of registration were not signed by at least two of the members of the Board of Registration for McCormick County."

As will appear by reference to this opinion objection to the grand jurors in question was made in that case *before they were even sworn as members of the grand jury,* and upon a true bill being found the attorney for the defendant moved before pleading thereto to quash the indictment on the same ground, the motion being overruled by the presiding Judge. It will thus be seen that timely objection was made to these grand jurors, and there was no contention whatever that there was any waiver by the defendant at any stage of the case.

After the decision in the case of *State v. Bibbs, supra,* it came to the attention of the Solicitor of the Thirteenth Circuit that probably there were no qualified electors in Pickens County, due to the fact that the Boards of Registration of that County had completely overlooked the mandatory requirements of the statutes with reference to the signing and delivery of certificates of registration. Thereupon the Solicitor presented his petition or complaint to the residing Judge of that Circuit, supported by affidavits, upon which Judge Oxner ordered on January 27, 1940, that the six

hold over grand jurors drawn at the September term, 1939, he discharged as grand jurors and dismissed from further attendance upon the Court, and that a new list of qualified jurors be prepared by the Jury Commissioners, it appearing that the Board of Registration was then registering applicants for new certificates in conformity with the statutes and in compliance with the opinion of this Court in the *Bibbs case*. The proceedings before Judge Oxner form a part of the record before us and it is quite clear that the purpose was to provide that thereafter jurors should be qualified electors pursuant in all respects to the decision of this Court. But it will be borne in mind that there is no suggestion in any of these proceedings that any member of the grand jury of Pickens County for the year 1939 did not have the constitutional qualifications to become an elector; and the only reason they could not be deemed qualified electors was that there was an irregularity in the issuance of their certificates. In other words, the statutory requirements were not observed by the Board of Registration.

It is quite true that this objection would have been a good and valid one if it had been raised at the proper time. The general rule is that such an objection should be made by demurrer or motion to quash before pleading to the indictment. And it was so held in the case of *State v. Boyd*, 56 S. C., 382, 34 S. E., 661, 662, where the defendant pleaded not guilty upon arraignment for a felony, but thereafter and before the petit jury was sworn moved to quash the indictment on the ground that one of the grand jury who passed upon it was related to the prosecuting witness and hence was not disinterested. The motion to quash was granted but upon appeal by the State to this Court it was reversed because the motion came too late. However, the Court held that this was not a case in which the alleged disqualification was discovered after the plea of not guilty. It was further held in this case that it was unnecessary to consider whether or not the relation-

ship of the grand juror to the prosecuting witness was a good ground for quashing the indictment. And the Court says: "But the authorities appear to hold that, while such objection may be ground for challenge before indictment found, it is not good ground for plea in abatement or motion to quash."

But it is not necessary to apply so strict a rule to the case at bar, because it is admitted, and the record shows beyond controversy, that the defendant expressly waived the alleged disqualification of the grand jurors. Indeed, it would be difficult to conceive of a case where greater care was used to make the waiver clear and unmistakable.

The record affirmatively shows that some time prior to the February, 1940, term of Court at a chance meeting of counsel in Greenville, the Solicitor inquired of counsel whether the defendant would make any motion in reference to the validity of the grand jury, and he replied that "he would confer with defendant and his brothers and let the Solicitor know"; and that a day or two before Court he informed the Solicitor that he had conferred with them "and defendant had agreed to waive right to quash the indictment."

The record shows that the Solicitor, at the hearing of the motions in arrest of judgment and for a new trial, made the following statement, the correctness of which does not appear to be questioned: "Some time during the week before the February term of Court in 1940, I talked to Mr. Martin, attorney for the defendant J. C. Hann, and asked him if he wanted me to hand out a new indictment. If I recall correctly, on Friday before this term of Court, Mr. Martin called me at my office in Greenville from his office in Greenville and stated he would waive his right to move to quash the indictment on the ground that the grand jury who passed on that indictment was disqualified; and I told Mr. Martin all I wanted to do was to hand to the grand jury on Monday morning a new indictment, if he expected to move to quash

the indictment; and that upon that agreement that he waive that right to move to quash, I did not prepare a new indictment."

When the case came up for trial in Pickens on the 19th day of February, 1940, Judge Thurmond, who was presiding, said to counsel for defendant in open Court: "Mr. Martin, is there any question about the issuance of proper registration certificates of the grand jury?" And Mr. Martin answered: "No, sir, your Honor, I agreed with the Solicitor that the defendant would waive any motion to quash the indictment because of any irregularities of the registration certificates issued to the grand jurors who returned the indictment in this case."

This colloquy took place before the trial had actually been entered upon, and it appears that the defendant had not then been brought into Court. But in the afternoon of the same day when the case was again called Mr. Martin reminded the Solicitor that the defendant was not in Court when the waiver was made. Stating Mr. Martin's exact language: "I just called my friend's attention to the fact that Mr. Hann was not in here this morning and I thought it proper to repeat that understanding," referring to the waiver. And then Mr. Martin said: *"We wish to waive any motion to quash."*

While it was incidentally suggested that the waiver was merely of a motion to quash and not a waiver of a motion in arrest of judgment, the point is so obviously unsound that counsel have not offered any argument in support of it. His position, however, taken with great earnestness, is that neither the defendant nor his counsel could make any effective waiver and that it would be against public policy to hold the defendant bound by such attempted waiver, and that the objection could be made at any time, especially because it goes to the jurisdiction of the subject matter, which cannot be conferred by consent, and our Constitution absolutely requires an indictment by a legally qualified grand

jury, (Art. I, § 17, and Art V, § 22), and hence to sustain a conviction under an indictment not so found would be to take the life of the defendant without due process of law and deprive him of the equal protection of the law, and thus deny to him his constitutional rights, both under the Constitution of this State, Art. I, § 5, and the Federal Constitution, 14th Amendment.

We adhere fully to the decision of this Court rendered by Mr. Justice Woods in the case of *State v. Lazarus*, 83 S. C., 215, 65 S. E., 270, 271, wherein the Court held that the law requires the presentment of a grand jury as a condition precedent to the trial of a crime (except certain minor offenses), the grand jury being a constituent part of the Court, and without its presentment the Court has no jurisdiction of the cause. Quoting from the opinion: "Hence an appellate court will declare void a conviction obtained in such case without the presentment of a grand jury, for lack of jurisdiction of the subject-matter in the trial Court. The same principle, of course, applies to an attempted conviction without the verdict of a petit jury. As we apprehend, it is in the application of this principle that the Courts hold that where the proceedings, resulting in the organization of those who acted either as grand jurors or petit jurors, are so contrary to law that either jury cannot be said to have any legal existence, the conviction is a nullity. In such case it is for lack of jurisdiction in the trial Court that the appellate Court will declare the conviction of no effect, even where the point is not made in the trial Court."

While we have read a number of cases involving the question before us we do not believe a clearer statement of the controlling principles can be found anywhere; and applying it to the case at bar we do not think it can possibly be said that the proceedings resulting in the organization of those who acted as grand jurors here was so contrary to law that the grand jury could not be

held to have any legal existence. Here the grand jury was duly drawn, duly organized, and acted upon the indictment in the regular and usual manner. It was a grand jury of the Court of General Sessions for the term at which the indictment was found. It was selected by the officers having lawful authority so to do. The members were duly sworn, and all the proceedings were regular in every respect, except only that it afterwards appeared that there was a statutory irregularity in the issuance of certificates of registration to these grand jurors, although each of them was qualified to receive a correct and proper certificate.

Judge Woods cites with approval the decision of the Supreme Court of the United States in the case of *United States v. Gale,* 109 U. S., 65, 3 S. Ct., 1, 27 L. Ed., 857, quoting the following from the opinion: " 'There are cases undoubtedly which admit of a different consideration, and in which the objection to the grand jury may be taken at any time. These are where the whole proceeding of forming the panel is void; as where the jury is not a jury of the Court or term in which the indictment is found; or has been selected by persons having no authority whatever to select them; or where they have not been sworn; or where some other fundamental requisite has not been complied with."

In the *Lazarus case* is was held that a motion after sentence to set aside a conviction on an indictment presented by a grand jury, because the writ of *venire facias* did not have attached the seal of the Court, comes too late, it being an irregularity, but one of record which should have been discovered before the trial; such irregularity not relating to a fundamental requisite.

The old case of *State v. Harden,* 2 Rich. Law 533, cited by counsel for defendant, is a good illustration of an objection to a jury (petit, in that case) which goes to its very legal existence, and does not relate to personal disqualifications of its members. For it was there held that the jurors summoned for an *extra* term, which had been ordered but

not held, could not be regarded as jurors of the *regular* term. Hence it was held that there was in legal effect no jury at the regular term, at which the defendant was convicted for the murder of a slave, and his conviction was set aside and the case remanded for a new trial. Clearly jurors drawn for one term have no power to act at another and different term.

In the case of *State v. Edwards,* 68 S. C., 318, 47 S. E., 395, 396, in which the opinion was delivered by Mr. Justice Jones, the Court held that the trial Judge did commit error in not sustaining a motion in arrest of judgment, because it appeared in that case that the grand jury which found the bill of indictment had been drawn under an act which was unconstitutional. Obviously this went to the very vitals of the grand jury, and since it had no valid existence the indictment so found by it was void, and the point could first be raised on motion in arrest of judgment. The Court says: "But the objection here goes deeper. It does not assert a disqualification which affects only a member of a body otherwise lawful, nor a mere irregularity in doing which the law requires, which assumes power to act; but it goes to existence of the grand jury as a body, that it is void as such, and that its indictment is therefore a nullity."

In the case of *State v. Rector,* 158 S. C., 212, 155 S. E., 385, the State appealed to this Court because the trial Judge quashed the indictment on motion of the defendants, the motion being based on the fact that at least 2 of the 17 jurors who were members of the grand jury when the true bill was found were not registered electors and hence were disqualified to act. The position was taken in that case that so long as twelve grand jurors duly qualified to act as such participated in the finding of a true bill the indictment was good, even if one or more disqualified grand jurors also took part in the finding, and certain decisions of this Court were cited as tending to support this view, including the case of *State v. Rafe,* 56 S. C., 379, 34 S. E., 660,

where reference was made to the fact that if all the members of the grand jury were disqualified, or if a true bill was found by a grand jury composed of only twelve men, one of whom was disqualified, the Court would necessarily conclud‹· that the bill was not found by a legal grand jury; but other wise this conclusion could not be drawn. But in the *Rector case* where an exhaustive and able opinion was delivered by Mr. Justice Blease, it was rightly held that there is no proper way to determine the number of grand jurors concurring in an indictment or whether the necessary number who did concur included members not qualified. And it was further pointed out by Mr. Justice Cothran in his concurring opinion that the participation of a disqualified grand juror would be illegal regardless of how many qualified grand jurors also participated. It follows therefore that if objection is timely made and not waived, the presence of even one such disqualified grand juror would render the finding illegal, and such illegality would be just as effective and significant as if all of them were likewise disqualified. But it is expressly recognized and laid down in this case that any objection of this kind may be waived by the defendant if he does not make it in time. We quote the following from the leading opinion of Mr. Justice Blease [158 S. C., 212, 155 S. E., 391]:

"While the disqualification of a grand juror may be waived by the defendant if he does not make the objection in time (*State v. Motley,* 7 Rich. [41 S. C. L.] 327, and *State v. Boyd,* 56 S. C., 382, 34 S. E., 661), yet when a defendant does insist *at the time when he may do so,* he is entitled, as a matter of constitutional right, to have the grand jury, which indicts him, composed only of such persons as the Constitution of the state has plainly declared may act thereon." (Italics added.) See also *State v. Wood,* 130 S. C., 88, 125 S. E., 566, and the cases therein cited.

Reference has heretofore been made to the fact that the irregularities in the issuance of the registration certificates to the grand jurors in question arose out

of the failure of the Boards of Registration to observe the *statutory* requirements; an irregularity quite sufficient indeed to warrant a motion to quash, but surely not sufficient to allow a defendant to make an express waiver and then when found guilty at a fair and impartial trial seek and obtain a new trial on the theory that he had no power to waive; bearing in mind that no question is made that the jurors were actually *good and lawful men* in the sense that they were entitled to receive proper certificates. It therefore seems to us significant that the General Assembly by an Act approved February 16, 1940, just prior to the trial of this case, Acts 1940, page 2056, 41 Ct. at Large 2056, provided that all certificates of registration issued to those who are qualified to receive the same under the laws of this State as electors since January 1, 1938, and up to January 1, 1940, "are hereby validated, ratified and confirmed, irrespective of any irregularities in the issuance of the said Certificates of Registration". However, we cite this act merely because it tends to show that the irregularities arose out of the failure to observe statutory requirements. Of course, the Constitution [Art. II, § 4, Subd. (f)] does require the General Assembly to provide "for issuing to each duly registered elector a certificate of registration", but the method of so doing, including the details, was left to the Legislature.

In the case of *State v. Faile*, 43 S. C., 52, 20 S. E., 798, 800, the Court held that a defendant might waive objection to the amendment of an indictment so as to add *alias* names of the deceased. The Court says: "The question in this case, however, is not whether such amendment is against the constitutional right guaranteed to the prisoner for his protection, but whether he has *waived* his right to insist upon such constitutional provision. These provisions of the Constitution are for the protection and benefit of the prisoner, and can be waived by him when in his judgment it is to his advantage to do so."

In addition to the quoted excerpt the opinion in this case states the law of waiver at considerable length to the general

effect that any of the constitutional rights and privileges accorded a defendant may be waived by him if he deems such waiver in his interest. It may indeed be that some of the expressions found in this opinion state the rule rather broadly, but it will be observed in this connection that in the case at bar counsel for defendant said that he wished to waive any motion to quash, and as pointed out by the Court in the *Faile case:* "It might work a great hardship on the prisoner not to be allowed to waive· even a constitutional right. He may be influenced to consent to such waiver because his witnesses are present, and he may fear that he will not be able to secure their attendance at a future term of the Court, or he may prefer to have his case tried by the jurors at that term of the Court, or he may be influenced to such action by numberless other considerations." But of course this language must be read in the light of the facts of that case and cannot be extended to a case where consent was given to a trial for murder by a jury of less than twelve men; for obviously such a fundamental requisite could not be waived. *State v. Hall,* 137 S. C., 261, 101 S. E., 662.

But it may well be that the defendant in the case at bar deemed it to his interest for some undisclosed reason to avail himself of the privilege of waiving any objection to the grand jurors, and no fundamental requisite being involved he had the right to do so.

We do not deem it necessary to base our conclusions on the authority of the *Faile case,* because we think that if the law be construed much more narrowly the instant case comes well within the sound principle that waiver of disqualification of individual members of the grand jury, even if it applies to all of them, does not involve the constitutional existence of the grand jury, especially where such disqualification was merely because of an irregularity in following the prescribed regulations and

could not in fact be deemed to have been in anywise actually prejudicial to the defendant.

The defendant was convicted of what appears from the evidence to have been a peculiarly heinous and horrible crime. But he had the right to invoke in his behalf every constitutional right or privilege, for he stands under a death sentence. We have, therefore, endeavored to give full and careful consideration to every point raised by his exceptions, even including those which were properly abandoned by his learned and experienced counsel, but after such consideration we are unable to find any error whatever in the record. Manifestly he received that fair and impartial trial guaranteed by the Constitution of this State, and a jury of his county has found him guilty, upon competent evidence the sufficiency of which cannot be questioned.

The judgment of the Circuit Court is affirmed.

MR. CHIEF JUSTICE BONHAM and MESSRS. JUSTICES BAKER, FISHBURNE and STUKES concur.